2005 UT 37

**Gary MACHAN, Plaintiff, Appellant, and Cross–Appellee,**

**v.**

**UNUM LIFE INSURANCE COMPANY OF AMERICA, Defendant, Appellee, and Cross–Appellant.**

**No. 20030789.**

Supreme Court of Utah.

June 17, 2005.

L. Rich Humpherys, Karra J. Porter, Salt Lake City, for plaintiff.

P. Bruce Badger, Scott M. Petersen, Salt Lake City, for defendant.

DURHAM, Chief Justice:

¶ 1 In this opinion we address two insurance law questions certified to us by the United States District Court for the District of Utah. The first question concerns the availability and scope of consequential damages in a first-party claim for breach of the express terms of an insurance contract. The second question asks whether an insured has a private right of action to enforce Utah Code section 31A–26–301, which requires timely payment of claims.

## BACKGROUND

¶ 2 The underlying dispute in the case before the federal district court involves claims for both breach of the express terms of a disability income insurance policy and breach of the implied covenant of good faith and fair dealing. Gary Machan, employed as a corporate executive in the construction and property development industry, had purchased the policy in 1988 directly from UNUM Life Insurance Company of America (UNUM) to insure against loss of income in the event he became unable to perform the duties of his occupation.

¶ 3 Machan filed a claim for benefits under this policy in March 1999, following complications from cardiac bypass surgery. He filed an additional claim in April 2000, in which he asserted mental impairment resulting from the surgery.[1] When UNUM failed to pay his claims beyond an initial two-week period,

Machan filed suit in state court. In addition to general damages, Machan sought consequential damages for, among other things, the worsening of his psychological condition, resulting in his inability to procure any gainful employment; the deprivation of, due to his inability to pay for, psychological treatment for himself and his mentally ill son; and the depletion of his assets and savings in order to meet basic living expenses. The case was removed to federal court on diversity grounds in November 2000.

¶ 4 In September 2002, before the trial date, UNUM agreed to pay Machan the monthly benefits he had requested under the policy, retroactive to March 1999. UNUM then filed a motion for summary judgment, seeking final judgment in its favor on Machan's claims for consequential damages. Having taken that motion under advisement, the federal district court certified to this court the above-mentioned two questions of state insurance law. We have jurisdiction pursuant to Utah Code section 78-2-2(1) (2002).

## ANALYSIS

¶ 5 As indicated above, the questions certified to us involve, first, the availability and scope of consequential damages in a claim for breach of the express terms of an insurance contract, and, second, the availability of a private right of action under Utah Code section 31A–26–301. We address each certified question in turn.

## I. CONSEQUENTIAL DAMAGES FOR EXPRESS BREACH OF AN INSURANCE CONTRACT

¶ 6 The first certified question asks:

In a first party insurance situation, may an insured recover consequential damages, other than attorney's fees, for breach of the express terms of an insurance contract? If so, what are the consequential damages that are recoverable for breach of the express terms of an insurance contract and how are they distinguished from the

---

1. According to the district court's certification order, Machan's bad faith claim relates only to

this second claim for benefits.

consequential damages for breach of the implied covenant of good faith and fair dealing that are recoverable under *Beck v. Farmers Insurance Exchange*, 701 P.2d 795, 801 (Utah 1985)?

¶ 7 In *Beck*, as discussed in further detail below, we laid out the measure of consequential damages available for an insurance company's refusal to investigate, evaluate, bargain, or settle a first-party insurance claim in good faith. 701 P.2d at 802. In doing so, we refused to adopt a tort approach for analyzing such bad faith claims, relying instead on the implied covenant of good faith and fair dealing that inheres in every contract. *Id.* at 799–800. We recognized that other courts had adopted the tort approach as a means of providing an insurer with incentive "to promptly and faithfully fulfill its contractual obligations," but we reasoned that this "practical end ... can be accomplished as well through a contract cause of action, without the analytical straining necessitated by the tort approach." *Id.* at 799.

¶ 8 UNUM urges us to conclude that, under *Beck*, the only damages available to an insured from an insurance company that breaches the express terms of the insurance contract, but not the implied covenant of good faith, are the benefits to which the insured is entitled under the policy, prejudgment interest, and reasonably foreseeable attorney's fees. UNUM argues that the goal of deterring insurance companies from bad faith conduct would be undermined if an insured is able to recover consequential damages even where bad faith cannot be proved.

■ ¶ 9 The implication of UNUM's argument is that in *Beck* we established a broad range of consequential damages for bad faith breaches by insurance companies simply for policy reasons. To the contrary, we believe our opinion in *Beck* was firmly grounded in contract principles. However, by recognizing "the unique nature and purpose of an insurance contract," *id.* at 802, *Beck* did signify an evolution in our understanding of what individuals are bargaining for when they enter into an insurance contract. In order to address the question before us, we must first clarify *Beck's* assessment of the nature of an insurance contract and how this assessment led to our holding in *Beck* regarding consequential damages. We then conclude that consequential damages are available for the breach of either the express or the implied terms of an insurance contract, but that the consequential damages available for breach of an insurance contract's express terms may be more limited in scope, based on the language of the contract and the extent to which any damages were caused by the breach.

### A. The Nature and Purpose of an Insurance Contract

¶ 10 Traditionally, insurance contracts were regarded as commercial contracts for money in which the insured has bargained for the insurance company's payment of a certain sum upon the occurrence of a specified event. *See Kewin v. Mass. Mut. Life Ins. Co.*, 409 Mich. 401, 295 N.W.2d 50, 53–55 (1980) (holding that "a disability income protection insurance policy contract is a commercial contract"); *Acquista v. N.Y. Life Ins. Co.*, 285 A.D.2d 73, 730 N.Y.S.2d 272, 276 (N.Y.App.Div.2001) (discussing the "traditional analysis," where "insurance policies are viewed as contracts for the payment of money only"). In accord with this understanding of the bargain, courts employing the traditional approach have limited an insured's damages to the amount owed under the terms of the policy, plus interest. *See New Orleans Ins. Co. v. Piaggio*, 16 Wall. 378, 83 U.S. 378, 386, 21 L.Ed. 358 (1872) (holding that an insured was not entitled to "special damages for the detention of money due to him beyond what the law allows as interest"); *Clark v. Life & Cas. Ins. Co.*, 245 Ky. 579, 53 S.W.2d 968, 969 (1932) (recognizing that "the measure of recovery for the failure to pay money is the amount agreed to be paid with legal interest"); *Acquista*, 730 N.Y.S.2d at 276 (recognizing that under the traditional analysis, "the damages available for an insurer's failure to pay or provide benefits have been limited to the amount of the policy plus interest"). These courts have reasoned that, because money was what the insured bargained for, the insured's receipt of the expected amount, plus interest, would suffice to place him in the position he would

have been in had the contract been performed. *See Kewin*, 295 N.W.2d at 55 ("In the commercial contract situation, ... the injury which arises upon a breach is a financial one, susceptible of accurate pecuniary estimation. The wrong suffered by the plaintiff is the same, whether the breaching party acts with a completely innocent motive or in bad faith.").

¶ 11 Crucial to the traditional understanding that insurance policies are commercial contracts for money was the assumption that the financial proceeds obtained through an insurance policy are somehow fungible—in other words, "that a[n insured] has access to an alternative source of funds from which to pay that which the insurer refuses to pay." *Acquista*, 730 N.Y.S.2d at 276. However, "[t]his is frequently an inaccurate assumption." *Id.* In fact, it seems clear that in many cases a large part of an insured's motivation for acquiring an insurance policy is his expectation that he may well be unable to find an alternative source of funds to cover the loss that the policy is meant to cover.

¶ 12 As a growing number of jurisdictions have recognized, the conception of an insurance policy as merely a commercial contract for money is flawed. " 'An insurance policy is not obtained for commercial advantage; it is obtained as protection against calamity.' " *The Best Place, Inc. v. Penn Am. Ins. Co.*, 82 Hawai'i 120, 920 P.2d 334, 342 (1996) (quoting *Noble v. Nat'l Am. Life Ins. Co.*, 128 Ariz. 188, 624 P.2d 866, 867 (1981)). " '[T]he insured's objective in buying [an insurance] company's express covenant to pay claims is security from financial loss which he [or she] may sustain from claims against him [or her] and protection against economic catastrophe in those situations in which he [or she] may be the victim.' " *Id.* at 344 (alteration in original) (quoting *Rawlings v. Apodaca*, 151 Ariz. 149, 726 P.2d 565, 570 (1986)); *see also Miller v. Fluharty*, 201 W.Va. 685, 500 S.E.2d 310, 319 (1997) ("[A] policyholder buys an insurance contract for peace of mind and security, not financial gain. . . . [A]ll policyholders ... should get their policy proceeds promptly without having to pay litigation fees to vindicate their rights." (footnote omitted)).

¶ 13 In *Beck*, this court joined those jurisdictions that have rejected the traditional view of insurance contracts as commercial contracts for money. We recognized "the unique nature and purpose of an insurance contract," in that "insurance frequently is purchased not only to provide funds in case of loss, but to provide peace of mind for the insured or his beneficiaries." *Beck*, 701 P.2d at 802. Essentially, what the insured has bargained for in the context of an insurance contract includes both "peace of mind" and the insurance company's payment of whatever sum is owed "within a reasonable period of time." *See id.*

¶ 14 In keeping with this modified and, we believe, more accurate assessment of the nature of insurance contracts, we concluded in *Beck* that, in the insurance policy context, the implied covenant of good faith and fair dealing, which inheres in all contracts, "contemplates, at the very least, that the insurer will diligently investigate the facts to enable it to determine whether a claim is valid, will fairly evaluate the claim, and will thereafter act promptly and reasonably in rejecting or settling the claim." *Id.* at 801.

### B. Consequential Damages for Breach of Insurance Contract

¶ 15 Having thus delineated the nature and purpose of an insurance contract, our opinion in *Beck* proceeded to apply contract law principles in order to determine the scope of available damages for breach of the implied covenant of good faith and fair dealing. We began with the general assertion that "[a]lthough the policy limits define the amount for which the insurer may be held responsible in performing the contract, they do not define the amount for which it may be liable upon a breach." *Id.* Rather, in addition to general damages—"those flowing naturally from the breach"—an insured is entitled to consequential damages—"those reasonably within the contemplation of, or reasonably foreseeable by, the parties at the time the contract was made." *Id.*

¶ 16 We further concluded that the consequential damages that an insured might foreseeably incur due to an insurance company's breach of the implied covenant of good faith

may encompass "losses well in excess of the policy limits, such as for a home or a business," and, "in unusual cases, damages for mental anguish." *Id.* at 802; *see also Acquista,* 730 N.Y.S.2d at 276 (recognizing that "an insured's inability to pay that which the insurer should be covering may result in further damage to the insured," including "the potential for emotional distress or even further physical injury that may result where a plaintiff under the strain of serious medical problems is forced to also undertake the stress of extended litigation").

¶ 17 Having discarded the notion that an insurance contract is merely a commercial contract for money, and having recognized that an insured may recover consequential damages beyond the amount prescribed by the insurance policy where the insurance company has breached the implied covenant of good faith and fair dealing, we are now presented with the question of whether an insured may also recover consequential damages where the insurance company has breached the express terms of the insurance contract, and, if so, how these damages differ from those available for breach of the implied covenant of good faith and fair dealing. As we have already stated, consequential damages are available under general contract law. In the context of breaches by an insurance company, this is true whether the company has breached the express terms of the contract or the implied covenant of good faith and fair dealing. In both cases, the insured is entitled to "those [damages] reasonably within the contemplation of, or reasonably foreseeable by, the parties at the time the contract was made." *Beck,* 701 P.2d at 801. In both cases, whether particular damages may be considered foreseeable "will always hinge upon the nature and language of the [insurance] contract and the reasonable expectations of the parties." *Id.* at 802.

¶ 18 This is not to say that an insured may in every instance recover the same measure of damages whether the proven breach is of the express contract terms or of the implied covenant of good faith and fair dealing. Indeed, we eschewed such a result in *Billings v. Union Bankers Insurance Co.,* 918 P.2d 461, 467 (Utah 1996). Our opinion in *Billings* made extensive reference to policy reasons for limiting damages for an insurance company's breach of the express terms of the contract where it acted in good faith, noting that "it would be unfair not to permit an insurer who has a legitimate dispute with an insured over a claim to have the dispute resolved before having to pay the claim." *Id.* However, our holding may more usefully be understood as simply recognizing that the available damages for the two types of breaches are likely to differ to the extent that a breach of the implied covenant is different in nature from a breach of express contractual terms.

¶ 19 For one thing, while the implied covenant of good faith and fair dealing may not be waived by either party, *Beck,* 701 P.2d at 801 n. 4, parties may, at least to some extent, contractually limit their expectations under the express terms of the contract by drafting its language accordingly.[2] If the language of an insurance policy explicitly obligates the insurance company to resolve claims within a reasonable time, the damages that may foreseeably result from the company's breach of this express obligation would be no different from the foreseeable damages for a breach of the company's implied duty, under the covenant of good faith, to resolve claims within a reasonable time. Where insurance contracts impose no such explicit good faith or other similar obligations on the insurance company, the insured will likely

**2.** We note that, because insurance companies are the parties responsible for drafting the language in their policies, and, in doing so, are generally equipped with a level of legal expertise not possessed by the ordinary policyholder, there are limits on the extent to which insurance policy language may waive an insured's entitlement to consequential damages for his objectively reasonable expectation of coverage. *See Billings,* 918 P.2d at 465 (recognizing that the implied covenant of good faith requires that "insurers act reasonably, as an objective matter, in dealing with their insureds"); *see also* Eugene R. Anderson & James J. Fournier, *Why Courts Enforce Insurance Policyholders' Objectively Reasonable Expectations of Insurance Coverage,* 5 Conn. Ins. L.J. 335, 351 (1998) (explaining that "[c]ourts ... will often enforce a policyholder's claim of insurance coverage despite a clearly drafted exclusion in the policy to the contrary" where the policyholder has an objectively reasonable expectation his claim would be covered).

have a claim for breach of the *express* terms of the contract only where the insurance company has incorrectly refused payment on a claim.

■ ¶ 20 It seems clear that both parties to an insurance contract should expect that an insurance company may require a reasonable amount of time to process or investigate a claim before determining whether to pay or deny it. *See Billings,* 918 P.2d at 465 (holding that "when an insured's claim is fairly debatable, the insurer is entitled to debate it and cannot be held to have breached the implied covenant if it chooses to do so").[3] Where an insurance company's breach consists only of ultimately resolving a claim incorrectly and failing to pay the insured, we may presume that any damages sustained by the insured during the initial reasonable investigation period were not *caused* by the breach, as these damages would have been sustained even if the insurance company had resolved the claim correctly in the insured's favor. *See Mahmood v. Ross,* 1999 UT 104, ¶ 20, 990 P.2d 933 ("To recover consequential damages, a non-breaching party must prove (1) that consequential damages were caused by the contract breach. . . .").

■ ¶ 21 In contrast, where the insurance company has unreasonably delayed processing a claim or has otherwise acted in bad faith during the investigation process, it is much more likely that any damages sustained by the insured were caused by the breach. In the latter case, the delay or other bad faith behavior is itself part of the breach, extending its duration over a significant time period, whereas in the former case, the breach has not begun until the incorrect decision has been made. Of course, once the insurance company has issued an incorrect decision, further damages, caused by the insurance company's mistaken assessment and its withholding of payment, may occur. To

the extent these damages are reasonably foreseeable, they should be included in the consequential damages calculation for breach of the express terms of the contract.

## II. PRIVATE CAUSE OF ACTION UNDER UTAH CODE SECTION 31A–26–301

■ ¶ 22 The second certified question asks:

Did Utah Code Ann. § 31A–26–301, entitled "Timely Payment of Claims," allow a private cause of action by the insured against his or her insurer for violation of the statute in 2000?

¶ 23 We have previously recognized the four-factor test established by the United States Supreme Court in *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), as providing guidance for the determination of whether an individual has a private right of action to enforce a state statute. We have articulated the relevant factors under *Cort* as:

(1) whether the plaintiff is a member of a class for whose special benefit the statute was enacted; (2) whether [the legislature] intended to create or deny a private remedy; (3) whether a private remedy would be consistent with the Statute's underlying purposes; and (4) the extent to which the cause of action is traditionally relegated to state law.

*Buckner v. Kennard,* 2004 UT 78, ¶ 39, 99 P.3d 842 (alteration in original) (internal quotation omitted). We have pointed out, however, that "a Utah court is not bound to apply the *Cort* factors in a manner identical to a federal court." *Id.* Moreover, we have generally observed that, in the absence of statutory language expressly indicating a legislative intent to grant a private right of action, Utah courts are reluctant to recognize

**3.** Machan urges this court to overturn our determination, in *Prince v. Bear River Mutual Insurance Co.,* 2002 UT 68, 56 P.3d 524, that an insured's claim was "fairly debatable" where a doctor, hired by the insurance company, had concluded, after examining the insured, that continued care was not medically necessary, leading the insurer to deny continued benefits. *See id.* at ¶ 35. Machan's concern, apparently, is that the

federal district court will apply *Prince* to the circumstances of his case even though UNUM's hired doctor apparently never examined Machan in person, and even though UNUM did not deny Machan's benefits in reliance on the doctor's report. However, that issue was not presented in the certified question before us, and we therefore decline to address it.

an implied right. *Id.* at ¶ 40 (citing *Miller v. Weaver*, 2003 UT 12, ¶ 20, 66 P.3d 592).

¶ 24 As our criterion is legislative intent, "[w]hether a particular statute provides a private right of action is a question of statutory interpretation." *Id.* at ¶ 41. We therefore look first to the plain language of the statute for an express indication that a private right of action was intended. *See id.* at ¶ 44.

¶ 25 Utah Code section 31A–26–301, as it existed in 2000, provided in relevant part:

(1) Unless otherwise provided by law, an insurer shall timely pay every valid insurance claim made by an insured. By rule the commissioner may prescribe the kinds of notice and proof of loss that will establish validity, the manner in which an insurer may make a bona fide denial of a claim, the periods of time within which payment is required to be made to be timely, and the reasonable interest rates to be charged upon late claim payments.

. . . .

(3) This section applies only to claims made by claimants in direct privity of contract with the insurer.

Utah Code Ann. § 31A–26–301 (2000) (amended 2001 & 2002). Nothing in this language expressly indicates that an individual insured may bring a claim against an insurer to enforce the timely payment requirement.

¶ 26 Machan argues that we should infer a legislative intent to grant a private right of action because one of the stated purposes of Chapter 26 of the Utah Insurance Code, in which this provision is located, is "to protect claimants under insurance policies from unfair claims adjustment practices." *Id.* § 31A–26–101(3). However, the same provision also indicates the additional goals of "promot[ing] the professional competence of those engaged in claims adjusting," *id.* § 31A–26–101(1), and "encourag[ing] fair and rapid settlement of claims," *id.* § 31A–26–101(2). It appears from these stated intentions that Chapter 26 is primarily aimed at promoting fair and professional conduct among insurance adjusters.

¶ 27 In the same vein, we note that the title of Chapter 26 is "Insurance Adjusters."

Part 2 of Chapter 26 is devoted to the topic of insurance adjuster licensing. *See id.* §§ 31A–26–201 to –215. Part 3 of Chapter 26, which contains the provision at issue, appears, to a large extent, to be aimed at regulating the insurance adjuster's performance of professional duties. *See id.* §§ 31A–26–301 to –311. Section 31A–26–213 provides a remedy for violation of insurance statutes and regulations—the termination of the insurance adjuster's license through an administrative proceeding. *Id.* § 31A–26–213(2). Based on this statutory scheme, we are reluctant to infer that the legislature intended to create a private right of action without explicit statutory language to that effect.

¶ 28 Moreover, the language in section 31A–26–101(3) quoted by Machan appears more closely related to section 31A–26–303, entitled "Unfair claim settlement practices." *See id.* § 31A–26–303. That section explicitly states that it "does not create any private cause of action." *Id.* § 31A–26–303(5). We cannot conclude, as Machan urges, that the legislature intended to grant a private right of action to enforce section 31A–26–301 simply because that section omits the explicit denial of a private right contained in section 31A–26–303. Rather, the denial of the private right of action in section 31A–26–303 likely represents the legislature's rejection of the foreseeable argument that such a right should be inferred based on section 31A–26–101(3).

¶ 29 In further support of his argument, Machan cites the legislative history of the 2001 amendment to section 31A–26–301, indicating that the amendments may have been intended to allow named insureds, other than the insured who holds the contract with the insurer, to enforce the timely payment requirement. However, as we are concerned here only with the 2000 version of the statute, the history of the 2001 amendment is of little relevance. We express no opinion on whether the current version of the statute provides a private right of action.

¶ 30 In addition, here, Machan, as the policyholder, does have a contract remedy against UNUM for any breach of either the express terms of the contract or the implied

covenant of good faith and fair dealing. Even in the absence of a private right of action under section 31A–26–301, we would deem it proper for a court to take into account the legislature's mandates, as well as the insurance commissioner's regulations, regarding insurance adjuster duties when making a determination of the parties' reasonable expectations under the contract. *See, e.g.,* Utah Admin. Code R590–192–10 (2005) (indicating what the commissioner has determined to be the "minimum standards for income replacement benefit determination"); *id.* R590–192–12 (containing the commissioner's findings regarding what constitutes unfair claim settlement practices). The presence of a contract remedy, we think, weighs against any inference that the legislature intended to allow separate claims under section 31A–26–301.

¶ 31 Based on these considerations, we conclude the 2000 version of Utah Code section 31A–26–301 did not allow a private cause of action by an insured against an insurer.

## CONCLUSION

¶ 32 In response to the certified questions presented to us, we hold, first, that plaintiffs may seek consequential damages when claiming breach of the express terms of an insurance contract. The scope of consequential damages available will differ from those available for breach of the implied covenant of good faith and fair dealing to the extent that the damages caused by breach of the express terms are limited by the language of the contract and the nature of the breach itself in relation to the insured's reasonable expectations. Second, we hold that an insured had no private right of action in 2000 to enforce Utah Code section 31A–26–301 against an insurer.

¶ 33 Justice DURRANT, Justice PARRISH, and Justice NEHRING concur in Chief Justice DURHAM'S opinion.

¶ 34 Associate Chief Justice WILKINS concurs in the result.