2006 UT 20

**Antoine SALEH, Plaintiff and Appellant,**

v.

**FARMERS INSURANCE EXCHANGE, Fire Insurance Exchange, dba Farmers Insurance Group, The Farmers Insurance Group of Companies, Defendants and Appellees.**

No. 20040584.

Supreme Court of Utah.

March 24, 2006.

Rehearing Denied March 24, 2006.

L. Rich Humpherys, Karra J. Porter, Salt Lake City, for plaintiff.

Aaron Alma Nelson, Salt Lake City, for defendants.

## AMENDED OPINION

NEHRING, Justice:

### INTRODUCTION

¶ 1 This appeal has its origins in a dispute between a homeowner, Antoine Saleh, and an insurance company, Farmers Insurance Exchange, over how much and when Farmers should have paid Mr. Saleh for fire damage to a residence Mr. Saleh owns in Salt Lake City. After a seven-day bench trial, the district court ruled that Farmers had breached its contract of insurance with Mr. Saleh and awarded him $1,252.80 in damages. In this appeal, Mr. Saleh challenges the adequacy of this award. He also insists that the district court erred in other significant ways. Most prominent among these other claims of error is Mr. Saleh's contention that the insurance contract required Farmers to pay Mr. Saleh for the cost of repairs as they were performed and not upon completion of the entire project as the district court held. Mr. Saleh also takes issue with the district court's summary rejection of his claims of breach of the implied covenant of good faith and fair dealing, misrepresentation, fraud, intentional infliction of emotional distress, deceptive advertising and marketing, and breach of warranty. Finally, Mr. Saleh claims that the district court erred in refusing to award attorney fees, litigation expenses, and prejudgment interest. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

¶ 2 Mr. Saleh purchased a home at 332 East 7th Avenue in Salt Lake City in 1995. He paid $130,000 for the dwelling. He insured the home with a homeowner's insurance policy from Farmers Insurance Exchange. On June 28, 1996, the house was damaged by a fire, a hazard covered by the Farmers policy.

¶ 3 Farmers assigned Mr. Saleh's claim to its adjuster, Marcia Brissenden. Ms. Brissenden received repair bids from two contractors. Only one of the bids included within the scope of the proposed work repairs

that conformed to existing building codes. Ms. Brissenden analyzed and compared the bids and concluded that the cost of repairs necessary to satisfy Farmers' liability was $92,364.64.

¶ 4 This sum was not, however, the only measure of Farmers' contractual obligation. Mr. Saleh's insurance policy provided that, if he chose not to repair or rebuild, Farmers would pay only the actual cash value (meaning the replacement cost at the time of loss, less depreciation) of the damaged or destroyed dwelling or structure. If Mr. Saleh elected to repair or replace the structure, Farmers would pay the replacement cost of that part of the structure with equivalent construction. However, Farmers would "pay no more than the actual cash value until repair or replacement is completed." As we will see, the conflicting interpretations of this language fueled the dispute that led to this litigation. After applying a depreciation factor to the cost of repair, Ms. Brissenden determined that the actual cash value of the Saleh house was $68,554.14.

¶ 5 Mr. Saleh signed a Proof of Loss form in which he confirmed the accuracy of the $92,364.64 that Ms. Brissenden had determined to be the amount Farmers would cover for repairs. On October 28, 1996, after receiving the form, Farmers sent Mr. Saleh a check that brought the total payments made for repairs on the house to $68,554.14, the actual cash value to which Mr. Saleh would be entitled if he did not undertake repairs. Farmers withheld $23,810.50—the difference between $92,364.64 and $68,554.14—which it indicated would be paid to Mr. Saleh upon completion of the repairs.

¶ 6 Mr. Saleh decided not to merely restore the house to its original condition, but to substantially increase its size and the quality of construction materials. The first contractor retained by Mr. Saleh, Maka Lelini Vai, determined that he could not complete the house for the agreed-upon fee and pulled off the job in April 1997. After Mr. Vai abandoned the project, Mr. Saleh undertook to complete the job by acting as his own contractor and by hiring his fiancée's father to assist.

¶ 7 Most of the work was completed under this arrangement, but Mr. Saleh claimed that his funds ran out in September 1997, and he consequently had to stop construction. During this time, Mr. Saleh attempted to get additional funds from Farmers, either by increasing the amount of his total claim, which would increase the amount of the actual cash value, or by acquiring the additional $23,810.50 earmarked for repairs but not advanced because all of the work had not been completed.

¶ 8 Mr. Saleh pursued the first option by calling Farmers on July 10, 1997, over eight months after signing the Proof of Loss form, and claiming that Ms. Brissenden had overlooked several items. Farmers rejected most of these claims as inflated estimates for damages Mr. Saleh had claimed previously, but it agreed to pay an additional $600 for repairs to the garage roof. Farmers then mailed a check to Mr. Saleh for $24,410.50, covering the remaining $23,810.50 owed upon completion and the $600 for the garage roof.

¶ 9 When Farmers tendered the payment of this sum to Mr. Saleh, it indicated that by cashing the check Mr. Saleh would confirm that the claim had been fully settled. However, Mr. Saleh refused to cash the check because he believed that additional legitimate claims remained unpaid.

¶ 10 Mr. Saleh claimed that Farmers breached its contract obligations to him both when it withheld the $23,810.50 pending completion of the repairs and when it refused to pay his additional claims of loss. According to Mr. Saleh, Farmers' behavior was in furtherance of corporate practices designed to minimize overpayments to policyholders, practices that exposed Farmers to liability for breach of the implied covenant of good faith and fair dealing, misrepresentation, fraud, intentional infliction of emotional distress, deceptive advertising and marketing, and breach of warranty. Of these additional claims, the district court summarily dismissed all but breach of the implied covenant of good faith and fair dealing, and the case went to trial on this claim and on Mr. Saleh's claims for breach of contract.

¶ 11 Following a seven-day bench trial, the court issued a *Memorandum Decision* finding

that there was a partial breach of contract and held Farmers liable for damages in the amounts of $1,252.80 to rebuild a wall and $10 in nominal damages to hardwood flooring that had not been paid in the original settlement. During the course of the trial, the court made various legal rulings, most notably concerning the admissibility of evidence, which are at issue on appeal. Mr. Saleh also objected to the court's conclusion that he was not entitled to attorney fees and prejudgment interest and appeals those decisions.

## ANALYSIS

### I. THE INSURANCE POLICY IS NOT AMBIGUOUS

¶ 12 The central issue presented in this appeal is at what point Farmers was obliged to pay Mr. Saleh the final $23,810.50. Most of the remaining issues orbit this one. The solution is obtained with aid from the tools of contract construction. We begin our analysis by examining the text of the disputed policy terms. They state:

Covered loss to Buildings under Coverage A and B will be settled by one of the following methods;

(1) **Actual Cash Value**

If you do not repair or replace at the same location shown in the Declarations the damaged or destroyed dwelling or separate structure, we will pay the smallest of the following:

(a) the limit of insurance applying to the damaged or destroyed dwelling or separate structure.

(b) the **actual cash value** of the damaged or destroyed dwelling or separate structure.

You may make a claim for an additional amount within 180 days after the loss on a replacement cost basis if the property has been repaired or replaced.

(2) Replacement Cost. If you repair or replace at the same location shown in the Declarations the damaged or destroyed dwelling or separate structure, we will pay without deduction for depreciation the smallest of the following amounts:

(a) the limit of insurance under this policy that applies to the damaged or destroyed dwelling or separate structure;

(b) the replacement cost of that part of the dwelling or separate structure damaged with equivalent construction and for use on the same premises.

(c) the amount actually needed and spent to repair or replace the dwelling or separate structure intended for the same occupancy and use. However, if the cost to repair or replace is more than $1,000 or more than 5% of the limit of insurance on the damaged or destroyed building, whichever is less, we will pay no more than the **actual cash value** until repair or replacement is completed.

¶ 13 As noted above, this contract language is benign until the arrival of its last clause, which authorizes Farmers to withhold payments for repair or replacement "until repair or replacement is completed." Farmers claims that this phrase means that it can retain the value of depreciation—here, the $23,810.50—until all phases of construction have been completed, while Mr. Saleh insists that the term is ambiguous and could be interpreted to mean that Farmers must make periodic payments from the depreciation reserve as significant amounts of repair and replacement work are completed.

¶ 14 The district court found no ambiguity in the phrase and agreed with Farmers' interpretation. We have stated that "[a]n insurance policy is merely a contract between the insured and the insurer and is construed pursuant to the same rules applied to ordinary contracts. Whether an ambiguity exists in a contract is a question of law." *Alf v. State Farm Fire & Cas. Co.*, 850 P.2d 1272, 1274 (Utah 1993). As a question of law, we review the district court for correctness.

¶ 15 A contract may be ambiguous because it is unclear, it omits terms, or "the terms used to express the intention of the parties may be understood to have two or more plausible meanings." *Id.* (internal quotation marks omitted). Here, we do not confront unclear language or omitted terms, but

rather Mr. Saleh's claim to alternate plausible interpretation.

¶ 16 "Plausible" entered the English language from the Latin verb "plaudere," to applaud. Although the primary meaning of the word has evolved to mean likely or reasonable to a degree falling somewhat short of certainty, vestiges of its root live on in its connotation. In other words, to earn the designation of plausible, a notion, explanation, or interpretation must impart confidence in its credibility sufficient to merit our applause. A standing ovation is not required, a discreet collision of the palms will do, but there must be reason to applaud.

¶ 17 Our cases that have required us to test for the presence of contract ambiguity have, not surprisingly, avoided an etymologically-based test of plausibility. Rather, we have been content to permit plausibility to speak for itself. For example, we stated that the proffered alternate interpretation "must be plausible and reasonable in light of the language used," *First Am. Title Ins. Co. v. J.B. Ranch, Inc.*, 966 P.2d 834, 837 (Utah 1998), and that to merit consideration as an interpretation that creates an ambiguity, the alternative rendition "must be based upon the usual and natural meaning of the language used and may not be the result of a forced or strained construction." *Home Sav. & Loan v. Aetna Cas. & Sur. Co.*, 817 P.2d 341, 367 (Utah Ct.App.1991) (internal quotation marks omitted). Although this court has left some discretion to courts in determining whether ambiguity exists, at minimum one universal standard applies to this determination: words and phrases do not qualify as ambiguous simply because one party seeks to endow them with a different interpretation according to his or her own interests. *Alf*, 850 P.2d at 1274–75; *accord U.S. Fid. & Guar. Co. v. Sandt*, 854 P.2d 519, 523 (Utah 1993).[1] In other words, for a proffered alter-

native interpretation to merit a court's applause, it must be more than a conjecture but may be less than a certainty.

¶ 18 With this in mind, we return to the phrase at hand: "[Farmers] will pay no more than the **actual cash value** until repair or replacement is completed." Mr. Saleh asks us to read "until repair or replacement is completed" as meaning "until significant repair or replacement is completed." Is this an interpretation that sparks the impulse to applaud? We think not. As used in this phrase, "repair or replacement" refers to the "damaged or destroyed dwelling or separate structure" described in the first paragraph of the section of the policy defining "Replacement Cost." Thus, it would be accurate to render the phrase in this way: "[Farmers] will pay no more than the **actual cash value** until the repair or replacement of the damaged or destroyed dwelling or separate structure is completed." It is difficult for us to extract from this language an alternative meaning to "is completed." It is, therefore, not plausible to suggest that the phrase can be interpreted to mean that repairs or replacement could be complete, but that additional repairs or replacements remained to be done. The work is either complete or it is not. To import the term "significant" into the phrase is to change the meaning of "complete" to "incomplete." This is an effort at interpretation that leaves us sitting on our hands.

¶ 19 We note that we are not alone in adopting this plain language interpretation of the payment timing clause at issue here. A substantial majority of jurisdictions that have analyzed replacement cost clauses share our conclusion that the payment timing language is unambiguous.[2]

¶ 20 Mr. Saleh points us to *Garnett v. Transamerica Insurance Services*, 118 Idaho

---

1. *Sandt's* test for ambiguity is worded slightly differently but is functionally equivalent.

2. *E.g., State Farm Fire & Cas. Co. v. Patrick*, 647 So.2d 983, 983 (Fla.Dist.Ct.App.1994) (holding that the trial court erred "in ignoring the plain language of the replacement cost policy"); *Nat'l Tea Co. v. Commerce & Indus. Ins. Co.*, 119 Ill.App.3d 195, 74 Ill.Dec. 704, 456 N.E.2d 206, 211 (1983) (holding that the policy is "clear and unambiguous"); *Bratcher v. State Farm Fire & Cas. Co.*, 961 P.2d 828, 831 (Okla.1998) (finding "plain meaning" in the clause); *Higgins v. Ins. Co. of N. Am.*, 256 Or. 151, 469 P.2d 766, 774 (1970) (finding "the language employed in the policy ... sufficiently clear"); *Ferguson v. Lakeland Mut. Ins. Co.*, 408 Pa.Super. 332, 596 A.2d 883, 885 (1991) (finding policy language "clear and unambiguous").

769, 800 P.2d 656 (1990), in which the Idaho Supreme Court required proportional payments toward the repair of the insured's building under the policy's replacement cost clause. That case did not, however, turn on an interpretation of the contract language. Indeed, the court recognized that a "literal reading" of the policy would require the insured to repair or replace the building "before being entitled to more than the actual cash value." *Id.* at 665. The court concluded that the unambiguous contract language was overcome by the fact that "Transamerica told the Garnetts that Transamerica was prepared to make proportional payments toward the repair of the building." *Id.* The result in *Garnett* was, therefore, "based on purely equitable considerations—something in the nature of estoppel." Johny Parker, *Replacement Cost Coverage: A Legal Primer*, 34 Wake Forest L.Rev. 295, 314–15 (1999).

¶ 21 Mr. Saleh argues, however, that even though he did not advance any equitable claims, the manner in which Farmers treated him has much in common with the way Transamerica treated the Garnetts and that these similarities would entitle him to relief under his legal claims. Mr. Saleh maintains that his evidence that Farmers had made proportional payments to other policy holders and that Farmers was pursuing an aggressive policy to reduce "overpayments" of claims is relevant to the interpretation of the payment timing clause and that the district court abused its discretion by not admitting the evidence. To embrace this view would require us to radically alter, and not for the better, our analytical approach to contract interpretation by making even unambiguous contract terms vulnerable to modification by extrinsic evidence. We choose to let stand undisturbed our long-standing interpretive guideposts, including the principle that "[i]f the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." *Green River Canal Co. v. Thayn*, 2003 UT 50, ¶ 17, 84 P.3d 1134.

¶ 22 Mr. Saleh's argument can be viewed as an attempt to recruit notions of fairness and equity [3] to tug on clear textual language and pull it into the realm of ambiguity. While equitable doctrines may intrude upon contract terms, even with the result of modifying or abrogating their terms, those doctrines, which generally appear in the form of estoppel, have not been raised here. When they are invoked, equitable doctrines like estoppel appear as independent claims and affirmative defenses that are replete with defining elements and standards of proof. *Prows v. State*, 822 P.2d 764, 768–69 (Utah 1991). Equitable doctrines are not, however, within the toolbox of contract interpretation. In the context of contract interpretation, therefore, it is irrelevant whether insurance companies, including Farmers, regularly pay the depreciation value prior to completion. It is likewise irrelevant whether Mr. Saleh can articulate a logical argument for paying before completion. Farmers has bound itself through textually unambiguous language, and it is not within this court's purview to bind it to more.

## II. THE UNAMBIGUITY DETERMINATION RESOLVES ADDITIONAL CLAIMS

¶ 23 Our legal conclusion that the payment timing clause in Farmers' policy unambigu-

---

3. This is not to say that we feel that interpreting the contract as Mr. Saleh suggests would result in a more "equitable" outcome. To the contrary, our interpretation today reflects a sound policy determination as well as the correct legal conclusion. The replacement cost clause at issue here is a crucial tool in which insurance companies protect against moral hazard, specifically, the opportunity for the insured to collect a windfall without having to replace the damaged or destroyed structure. The possibility of holding the insurance company responsible for multiple payments throughout the rebuilding process is equally unpalatable because of the transaction costs that would be associated with frequent inspections, analyses, and payments throughout the reconstruction. These transaction costs would require higher premiums on all insurance customers to cover the increased costs. Finally, there is little reason to believe that an insured would be unable to acquire sufficient funding to rebuild without an up-front payment. As here, there is no doubt that an insured will be able to collect the full amount once construction is completed. This certain future cash stream should serve as sufficient security for the insured to acquire capital if liquid assets are otherwise unavailable.

ously justified the company's decision to withhold the funds representing the depreciated value of the structure until the repairs were completed leads us to reject Mr. Saleh's challenges to the district court's exclusion of evidence relating to: (1) standards of the insurance industry, (2) Farmers' interpretation of its own policy language, (3) Farmers' practices and procedures, and (4) other evidence of Farmers' internal policies and programs. Since the clause was unambiguous, there is no need to try to divine its meaning from evidence outside the four corners of the contract.

¶ 24 Our determination of the contract interpretation issue also causes Mr. Saleh's challenge to the district court's ruling that his claim against Farmers was fairly debatable to fall away. Mr. Saleh concedes this point in his brief. If a claim brought by an insured against an insurer is fairly debatable, failure to comply with the insured's demands cannot form the basis of bad faith. *Prince v. Bear River Mut. Ins. Co.*, 2002 UT 68, ¶ 34, 56 P.3d 524. Likewise, if an insurer's "reason for denying benefits under the policy is fairly debatable, then [the insurer's] denial does not rise to the level of outrageous conduct that could give rise to liability for intentional infliction of emotional distress." *Id.* ¶ 39.

¶ 25 Furthermore, because there was no bad faith in Farmers' actions, attorney fees are not available. It is settled law that in order to recover attorney fees for breach of contract, they must be authorized by a statute or a contract provision, *id.* ¶ 52, or there must have been bad faith. *Lieber v. ITT Hartford Ins. Ctr. Inc.*, 2000 UT 90, ¶ 16, 15 P.3d 1030.[4]

### III. THE DISTRICT COURT CORRECTLY RESOLVED MR. SALEH'S OTHER CLAIMS

¶ 26 The district court dismissed Mr. Saleh's claims of fraud and misrepresentation and statutory causes of action through summary judgment. An appellate court reviews a trial court's grant of summary judgment for correctness, giving no deference to its conclusions of law. *Jones v. ERA Brokers Consol.*, 2000 UT 61, ¶ 8, 6 P.3d 1129. The fraud and misrepresentation claims were to be based on the disallowed evidence regarding Farmers' company policies and industry standards. This evidence purportedly would have shown that Farmers had a corpo-

---

4. Mr. Saleh insists that attorney fees are available for a simple breach of an insurance contract's express term. To support this claim, he relies on *Billings v. Union Bankers Insurance Co.*, 918 P.2d 461, 468 (Utah 1996), which states that "[a]ttorney fees may be recoverable as consequential damages flowing from an insurer's breach of either the express or the implied terms of an insurance contract." *Billings* traces this principle to *Canyon Country Store v. Bracey*, 781 P.2d 414, 420 (Utah 1989). *Bracey* permits attorney fees to be recovered as consequential damages flowing from an insurer's breach of contract, but is silent on the topic of whether the reach of consequential damages extends both to express terms and to the implied covenant of good faith and fair dealing. However, the case that *Bracey* looks to, *Beck v. Farmers Insurance Exchange*, 701 P.2d 795, 801–02 (Utah 1985), discusses the subject of when attorney fees are available for breach of contract. As *Billings* itself recognizes, "Beck [sic] did not deal with a breach of the underlying insurance contract's express provisions, but only with a breach of the implied covenant of good faith and fair dealing." *Billings*, 918 P.2d at 466. Furthermore, *Beck* concludes that consequential damages (which include attorney fees) are only available when there has been a breach of the implied covenant of good faith and fair dealing. *Beck*, 701 P.2d at 801–02.

*Billings* distinguishes between allowing the recovery of consequential damages for breaches of the express contract and implied contractual covenants, stating that "consequential damage[s] ... [are] available only for breach of the implied covenant, not ... for breach of the express terms of the contract." 918 P.2d at 466. It reaches this rule by reasoning that

it would be unfair not to permit an insurer who has a legitimate dispute with an insured over a claim to have the dispute resolved before having to pay the claim. Exposure to the sweeping measure of damages available for breach of the implied covenant would effectively deny any careful insurer the option of declining to pay a contested claim and awaiting the outcome of the dispute.

*Id.* at 467.

We see no reason why *Billings* would unequivocally align itself with *Beck* and then do a complete about-face. As illustrated, this court has historically limited the availability of consequential damages to breaches of the covenant of good faith and fair dealing. The admittedly unclear language suggesting the contrary in *Billings* does not change that policy.

rate policy geared towards eliminating overpayment of claims. Viewed in the light most favorable to the non-moving party, this evidence would not form a basis for fraud. Mr. Saleh cannot reasonably contend that he was entitled to be overpaid for his claim. Instead, he appears to suggest that the elimination of overpayments is merely corporate code for encouraging underpayment of valid claims. Nothing in the summary judgment record permits the application of a sinister gloss to Farmers' policy of preventing overpayment. Mr. Saleh alleges that Farmers' policies are equivalent to those at question in *Campbell v. State Farm Mutual Automobile Insurance Co.*, 2001 UT 89, 65 P.3d 1134 (2001), *rev'd on other grounds*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585. Such a claim is without merit. Mere efforts to avoid overpayment and to detect customer fraud are entirely different from the deceptive and fraudulent practices pursued in *Campbell*.

¶ 27 As for the claimed statutory causes of action, this court recently held that Utah Code section 31A–26–301 does not allow a private cause of action by an insured against an insurer. *Machan v. UNUM Life Ins. Co. of Am.*, 2005 UT 37, ¶ 31, 116 P.3d 342.

## IV.  PREJUDGMENT INTEREST IS NOT AVAILABLE

▮▮ ¶ 28 Prejudgment interest may be recovered where the damage is complete, the amount of the loss is fixed as of a particular time, and the loss is measurable by facts and figures. *Cornia v. Wilcox*, 898 P.2d 1379, 1387 (Utah 1995). Generally, a "decision to grant or deny prejudgment interest presents a question of law which we review for correctness." *Id.* However, when the trial court applies the facts of the case to the law then the question is a mixed question of fact and law, and the factual basis underpinning the decision is subject to a clearly erroneous standard. *State v. Pena*, 869 P.2d 932, 935–36 (Utah 1994). In this case, the district court agreed with Farmers that the additional amounts owed under the policy were not ascertainable by Farmers until additional evidence was presented at trial. The district court ruled that because the claim was not liquidated before trial, prejudgment interest

was unavailable. We find no basis upon which to challenge the soundness of this ruling and therefore do not disturb it.

## V.  DAMAGES AWARDED WERE ADEQUATE

▮▮ ¶ 29 The award of damages is a factual determination that we review for clear error. *State v. Pena*, 869 P.2d 932, 935–36 (Utah 1994). Mr. Saleh has failed to show that the factual support for the district court's award of damages falls short of this standard. The district court considered voluminous evidence regarding the scope of damage to the Saleh home and the nature of the repairs necessary to restore the home to its original state while complying with the building code. We are not persuaded that the damage award is clearly contrary to the weight of that evidence, nor do we have a firm and definite conviction that the district court was mistaken in reaching its damage award. *State v. Walker*, 743 P.2d 191, 193 (Utah 1987).

## CONCLUSION

¶ 30 No ambiguity existed in the term of the insurance policy that Mr. Saleh purchased from Farmers guaranteeing the timing of payment for Mr. Saleh's claim; therefore, we conclude that under the policy Farmers was under no obligation to pay the full recovery until all of the repairs were completed. Most of Mr. Saleh's remaining claims are left meritless upon this conclusion, and he fails to convince us that the district court was clearly erroneous in its factual findings. Consequently, the district court's decision is affirmed in its entirety.

¶ 31 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice DURRANT, and Justice PARRISH concur in Justice NEHRING's opinion.