2007 UT 27

**Robert and Sue QUAID, individually and as guardians of Skylar Quaid, Plaintiffs and Appellants,**

v.

**U.S. HEALTHCARE, INC., dba Aetna U.S. Healthcare; Hoffman Products New York Medical Benefits Plan; and Loren Cook Company Health Care Benefit Plan, Defendants and Appellees.**

No. 20051066.

Supreme Court of Utah.

March 23, 2007.

Brian S. King, James L. Harris, Salt Lake City, for plaintiffs.

Gary L. Johnson, Martha Knudson, Salt Lake City, for defendants.

PARRISH, Justice:

## INTRODUCTION

¶ 1 Robert and Sue Quaid ask this court to reverse the district court's summary judgment ruling that the Loren Cook Company Health Care Benefit Plan (the "Loren Cook plan") was not liable for covering the medical expenses of their newly adopted son, Skylar Quaid, because Skylar was also covered under his birth parents' HMO policy provided by Aetna U.S. Healthcare (the "Aetna policy"). We find that the Aetna policy's cover-

age of Skylar effectively ceased when the parental rights of his birth parents were terminated. Consequently, the Loren Cook plan's coordination of benefits ("COB") provision does not operate to deny Skylar coverage. We therefore reverse the district court's summary judgment ruling and remand the case for further proceedings consistent with this opinion.

## BACKGROUND

¶ 2 Skylar Quaid [1] was born in New York on June 24, 1999. He suffered from severe birth defects, including congenital heart disease. His illnesses rendered him totally disabled, and he received inpatient treatment at Schneider Children's Hospital in New York. Robert and Sue Quaid initiated adoption proceedings in the fall of 1999. The Quaids' adoption of Skylar was finalized on November 14, 1999,[2] after which they began planning to move Skylar to his new home in Utah.

¶ 3 Prior to the initiation of adoption proceedings, Skylar's treatment at Schneider Children's Hospital was covered by his birth parents' Aetna policy. Robert Quaid, who was then employed by the Loren Cook Company, added Skylar to the Loren Cook plan on December 3, 1999, and his coverage was retroactive to November 19, 1999.[3] The Loren Cook plan is an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). Despite Skylar's enrollment, Loren Cook refused to guarantee Skylar coverage upon his arrival in Utah until it could determine how benefits should be coordinated with the Aetna policy.

---

1. Skylar's adoption proceedings are sealed. In consideration of his birth parents' privacy, we will refer to him throughout this opinion by his adopted name, Skylar Quaid.

2. There is conflicting evidence about when the Quaids' adoption of Skylar took place. Loren Cook contends that adoption proceedings were merely initiated in November 1999, while the Quaids contend that the adoption paperwork was completed and parental rights were terminated on November 14, 1999. There is evidence in the record, however, that an official decree of adoption was signed by a Utah district court judge on May 8, 2000. The first provision of that adoption

decree terminated the parental rights of Skylar's birth parents. Because this is an appeal from summary judgment, we view disputed facts in the light most favorable to the nonmoving party. *Surety Underwriters v. E & C Trucking, Inc.*, 2000 UT 71, ¶ 15, 10 P.3d 338. Consequently, for the purposes of this opinion, we proceed with the assumption that the parental rights of Skylar's birth parents were terminated on November 14, 1999.

3. The reason why coverage was provided from November 19, 1999, onward, rather than from November 14, 1999, the day on which the Quaids contend the adoption was final, is unclear.

¶ 4 Utah Medicaid agreed to cover Skylar's prospective treatment at Primary Children's Medical Center ("Primary Children's") while the Quaids sorted out coverage with their private insurance company. Although the transportation costs were beyond the terms of the Aetna policy, Aetna agreed to pay for Skylar's trip to Salt Lake City after it was assured that another party would assume responsibility for coverage once Skylar was in Utah. The Quaids and Aetna's regional general counsel, James E. Brown, understood that this service marked the end of Aetna's obligation to Skylar. On December 23, 1999, Skylar's health was stable enough to allow travel, and the Quaids brought him to Primary Children's in Salt Lake City.

¶ 5 Ultimately, the administrators of the Loren Cook plan denied coverage of Skylar's medical treatment at Primary Children's because they believed that Aetna was liable as Skylar's primary insurance provider. They based their reasoning on various provisions of both plans. The Loren Cook plan's COB provision states that "[i]f a Plan Participant is under a disability extension from a previous benefit plan, that benefit plan will pay first and this Plan will pay second." The Aetna policy does have a provision that extends benefits to totally disabled members for up to a year after termination of their coverage. The Loren Cook plan's COB provision further provides that it will deny coverage when "an HMO or network plan is primary" and the covered person does not use the HMO's services.

¶ 6 Aetna likewise denied claims submitted for Skylar's care because he was treated outside of its New York-based provider network. In communications with Loren Cook plan administrators, however, Aetna representatives did state that the extension of benefits provision would have provided Skylar with benefits had he stayed in New York. Skylar's medical bills exceeded $420,000 and were ultimately paid by Utah State Medicaid.

¶ 7 The Quaids brought suit against Aetna and the Loren Cook plan in district court. The Quaids later abandoned their claim against Aetna. Following discovery, both the Quaids and Loren Cook moved for summary judgment. The trial court granted summary judgment to Loren Cook, finding that an extension of benefits based on total disability was available to Skylar under the Aetna policy and that, consequently, the COB provision precluded coverage under the Loren Cook plan. The Quaids appealed to this court; we have jurisdiction pursuant to Utah Code section 78–2–2(3)(j).

## STANDARD OF REVIEW

¶ 8 On summary judgment, we review the trial court's legal conclusions for correctness, assuming that the material facts are not in question. *Surety Underwriters v. E & C Trucking, Inc.*, 2000 UT 71, ¶ 14, 10 P.3d 338. If there is a factual dispute, we view the facts in the light most favorable to the nonmoving party. *Id.* ¶ 15.

## ANALYSIS

¶ 9 The Quaids argue that an exclusion within the Aetna policy precludes Skylar from receiving any benefits under Aetna's extension of benefits provision and that, consequently, Loren Cook is liable for Skylar's medical care. Because we agree with this contention, we decline to consider the Quaids' alternative argument that 29 U.S.C. § 1169(c) overrides the COB provision of the Loren Cook plan.

### I. WE INTERPRET EACH INSURANCE POLICY ON THE BASIS OF ITS PLAIN LANGUAGE

¶ 10 Our analysis is rooted in the concept that an insurance policy is a contract between two parties. *Benjamin v. Amica Mut. Ins. Co.*, 2006 UT 37, ¶ 14, 140 P.3d 1210. If the language within the four corners of the policy is unambiguous, the parties' intent should be surmised from the "'plain meaning of the contractual language.'" *Id.* (quoting *Saleh v. Farmers Ins. Exch.*, 2006 UT 20, 21, 133 P.3d 428). Exclusions from coverage are interpreted no differently when the policy language is clear. *See S.W. Energy Corp. v. Cont'l Ins. Co.*, 1999 UT 23, ¶ 13, 974 P.2d 1239 (holding that unambiguous language is given its ordinary meaning regardless of whether the specific provision works to affirm or deny coverage);

*Alf v. State Farm Fire & Cas. Co.*, 850 P.2d 1272, 1275 (Utah 1993) (rejecting the argument that an exclusion was ambiguous and unenforceable because it was inconsistent with the expectation of coverage); *Allen v. Prudential Prop. & Cas. Ins. Co.*, 839 P.2d 798, 803 (Utah 1992) (finding that even though "an insurance contract is adhesive [that] is no reason, in itself, to enforce what might be found to be the reasonable expectations of the insured when those expectations conflict with the plain terms of the policy"). Insurance policy language is considered ambiguous if it is "unclear, it omits terms, or the terms used to express the intentions of the parties may be understood to have two or more plausible meanings." *Saleh*, 2006 UT 20, ¶ 15, 133 P.3d 428 (internal quotation marks and citation omitted).

¶ 11 Loren Cook places a great deal of reliance on interpretations of the Aetna policy by James E. Brown, Aetna's regional general counsel. Neither party asserts, however, that the language of either plan is ambiguous, and we agree. Consequently, we refrain from using external sources to interpret the plain language of each contract. *See Bakowski v. Mountain States Steel, Inc.*, 2002 UT 62, ¶ 16, 52 P.3d 1179 ("[A] court will look to extrinsic evidence only when the contract language is ambiguous.").[4]

## II. THE LOREN COOK PLAN IS LIABLE FOR SKYLAR'S MEDICAL COVERAGE FROM THE POINT WHEN HIS BIRTH PARENTS' PARENTAL RIGHTS WERE TERMINATED

¶ 12 With the termination of their parental rights, any legal obligation between Skylar and his birth parents was severed. The Aetna policy excludes from coverage any service that a member is not legally obligated to pay. This exclusion countermands the extension of benefits provision, removing from coverage all of Skylar's treatment after the termination of his birth parents' parental rights. Because Skylar's treatment would not have been covered by Aetna regardless of location, the Loren Cook plan's COB provision does not exclude Skylar's treatment from coverage.

### A. The Applicability of Aetna's Exclusion for Services for Which a Member Is Not Legally Obligated to Pay

¶ 13 The lead-in clause of the "Exclusions and Limitations" section of the Aetna plan states, "The following are not Covered Benefits except as described in the Covered Benefits section of this Certificate or by a rider attached to this Certificate."[5] Following the lead-in clause, the section alphabetically lists services, from beam neurologic testing to religious counseling, that are not covered benefits. Within this list is an exclusion for "services for which a Member is not legally obligated to pay in the absence of this coverage."[6]

¶ 14 Covered benefits are defined as "Medically Necessary Services and supplies set forth in this Certificate which are covered subject to all of the terms and conditions of the Group Agreement and Certificate." Because covered benefits are subject to "all of the terms and conditions" of the Aetna policy, any reference to "covered benefits" within the policy necessarily includes consideration

---

4. The United States Supreme Court also has stated that the interpretation of ERISA plans like the Loren Cook plan at issue should be based on their plain language. *See Curtiss–Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995) (instructing courts to rely on the "face of written plan documents" when interpreting ERISA plans); *Allison v. Bank One–Denver*, 289 F.3d 1223, 1236 (10th Cir.2002) ("We have repeatedly rejected efforts to stray from the express terms of the plan, regardless of whom those express terms may benefit.").

5. The phrase "except as described in the Covered Benefits section of this Certificate or by a rider attached to this Certificate" indicates that an explicit inclusion of a service in the covered benefits section will trump an exclusion of the same service in the exclusions and limitations section. For instance, the rider providing limited coverage for prescription lenses overrides the exclusion for "vision care services and supplies."

6. There are other exclusions in the list based on the context in which service is provided rather than the service itself. For instance, the section excludes "payment for benefits for which Medicare ... is the primary payer" and "services resulting from the commission or attempt to commit a felony."

of the exclusion for "services for which a Member is not legally obligated to pay." In short, if the exclusion is applicable in this case, it would affect any coverage for which Skylar might otherwise have been eligible under Aetna's extension of benefits provision.[7]

¶ 15 "Member" is defined in the Aetna policy as a "Subscriber or Covered Dependent." Skylar's biological father was a subscriber under the Aetna policy. Skylar was a covered dependent under the Aetna policy until his birth parents relinquished their parental rights. We therefore consider whether Skylar or his birth parents had a legal obligation to pay for his care absent Aetna's coverage.

¶ 16 When Skylar's birth parents relinquished their parental rights, they had no further legal obligation to pay for his care. Under New York law,[8] "after the making of an order of adoption the birth parents of the adoptive child shall be relieved of all parental duties toward and of all responsibilities for and shall have no rights over such adoptive child." N.Y. Dom. Rel. Law § 117, 1(a) (Consol.2006).[9]

¶ 17 Next, we consider whether Skylar, though an infant, had any legal obligation to pay for his care. Under New York law, an unemancipated minor in the custody of his or her parent has "no responsibility for satisfying ... hospital charges." *Albany Med. Ctr. Hosp. v. Johnston,* 102 A.D.2d 915, 916,

477 N.Y.S.2d 499 (1984). Because Skylar was in the custody of either his birth parents or his adoptive parents during the period of treatment in question, he was without obligation to pay for his medical care. In sum, the exclusion applies because neither Skylar nor his birth parents had a legal obligation to pay for his medical services.

¶ 18 Although we acknowledge that the drafting and placement of this exclusion are not ideal, the exclusion is nevertheless enforceable. The language clearly precludes from coverage any service for which a member has no legal obligation to pay. While it is true that the exclusion is included in a long list of coverage exclusions, the heading informs the reader of the section's import. Further, the certificate of coverage warns the insured in bold, capitalized letters that "[I]T IS THE CONTRACT HOLDER'S AND THE MEMBER'S RESPONSIBILITY TO UNDERSTAND THE TERMS AND CONDITIONS IN THIS CERTIFICATE. IN SOME CIRCUMSTANCES, CERTAIN MEDICAL SERVICES ARE NOT COVERED OR MAY REQUIRE PREAUTHORIZATION BY HMO." The unambiguous nature of the exclusion requires its enforcement.

**B. *The Effect of the Exclusion on the Extension of Benefits Provision in the Aetna Policy***

¶ 19 Having determined that the exclusion applies to Skylar, we next consider its

7. Defendants argue that this exclusion has nothing to do with Aetna's extension of benefits provision. In support of this contention, they rely exclusively on the testimony of Mr. Brown, who testified that Skylar was covered under the extension of benefits provision, but acknowledged that he had not focused on the exclusion. Rather than relying on his conjecture, we base our evaluation on the plain policy language.

8. For the purposes of this opinion, we assume that Skylar's adoption was finalized in New York, *see supra* note 1, and consequently analyze the obligations of Skylar's birth parents under New York law. Because there is some indication in the record, however, that Skylar's adoption was finalized in Utah, we note that our analysis of parental rights would be the same under Utah law. In Utah, the termination of parental rights is defined as "the permanent elimination of all parental rights and duties, including residual pa-

rental rights and duties, by court order." Utah Code Ann. § 78–3a–103(1)(ee) (Supp.2006). After parental rights have been terminated, familial ties through the birth parents are not legally recognized. *See, e.g., Kasper v. Nordfelt,* 815 P.2d 747, 750 (Utah Ct.App.1991) (holding that grandparent visitation rights are severed "where the rights of natural parents are terminated and the grandchildren are adopted by nonrelatives").

9. Although it appears from the spotty record that the adoption and termination of the birth parents' parental rights occurred simultaneously, we emphasize that Aetna ceased to be liable for Skylar when the parental rights were terminated. By its terms, the Loren Cook plan's coverage provided for Skylar's medical care from that point forward inasmuch as the plan includes in its listing of covered dependents "children placed with a covered employee in anticipation of adoption."

operation in relation to the Aetna policy. Neither party contests that Skylar's status as a dependent eligible for enrollment under the Aetna policy terminated when Skylar was adopted. Rather, the dispute turns on the operation of Aetna's extension of benefits provision, which extends limited benefits to those who meet its terms when full coverage has terminated. Consequently, we carefully review the extension of benefits provision, which reads as follows:

> Any Member who is Totally Disabled on the date coverage under this Certificate terminates is covered in accordance with the Certificate.

> This extension of benefits shall only:

> 1. commence when a Medical Service is rendered for the condition causing Total Disability while the Member is covered under this Certificate; and

> 2. provide Covered Benefits that are necessary to treat medical conditions causing or directly related to the disability as determined by HMO; and

> 3. remain in effect until the earlier of the date that:

> a. the Member is no longer Totally Disabled; or

> b. the Member has exhausted the Covered Benefits available for treatment of that condition; or

> c. after a period of twelve (12) months in which benefits under such coverage are provided to the Member.

¶ 20 Skylar was unquestionably covered as a dependent of his birth father prior to the termination of parental rights, so he meets the provision's threshold requirement: coverage prior to termination.

¶ 21 The exclusion at issue, however, clearly operates to eliminate all services that would otherwise be available under the extension of benefits provision. The provision is narrowly drawn to "provide Covered Benefits" only for conditions relating to the former member's disability. And the exclusion removes from the "Covered Benefits" category any service for which the member has no legal obligation to pay. Further, the extension of benefits provision remains in effect only until "the member has exhausted the

Covered Benefits available for treatment of that condition." In effect, Skylar "exhausted" the benefits he was eligible to receive upon the termination of his birth parents' parental rights because, at that point, neither he nor his birth parents had any legal obligation to pay for his care. Thus, the policy's exclusion eviscerates any potentially available service under Aetna's extension of benefits provision.

*C. The Effect of the Exclusion on the Loren Cook Plan's Coordination of Benefits Provision*

¶ 22 Having determined that the exclusion eviscerates any coverage under the Aetna policy's extension of benefits provision, we now turn to the Loren Cook plan's COB provision. The COB provision provides an order for payment when alternate coverage exists. Because we have concluded that the Aetna policy does not cover any of the services provided to Skylar after the termination of his birth parents' parental rights, the very applicability of the COB provision is highly suspect.

¶ 23 Even assuming its applicability, however, the COB provision does not relieve the Loren Cook plan from liability for Skylar's care. The COB provision states that the plan will not cover "any charge that would have been covered by the HMO or network plan had the Covered Person used the services of an HMO or network provider." Had Skylar used Aetna's services, the Aetna policy still would not have covered those services because neither Skylar nor his biological parents had an obligation to pay for them. Therefore, we conclude that the COB provision does not excuse the Loren Cook plan from its obligation to pay for Skylar's medical care during the year after his adoption.

### CONCLUSION

¶ 24 Skylar was excluded from receiving benefits under his birth parents' Aetna policy when their parental rights were terminated. The Aetna policy excludes from coverage "services for which a Member is not legally obligated to pay in the absence of this coverage." This exclusion prevents Skylar from

receiving any benefits under Aetna's extension of benefits provision. As a result, the Loren Cook plan's COB provision does not operate to deny Skylar coverage. We therefore reverse and remand to the district court for proceedings consistent with this opinion.

¶ 25 Associate Chief Justice WILKINS and Justice DURRANT concur in Justice PARRISH'S opinion.

NEHRING, Justice, concurring:

¶ 26 I join in Justice Parrish's opinion. I write separately because I believe it is important to bring proper comfort to adoptive parents by confirming that provisions of the Employee Retirement Income Security Act of 1974 (ERISA),[1] guarantee that the adoption of a child who had the good fortune to have been covered by health insurance will not result in the perverse outcome urged on us by the defendant insurers.

¶ 27 That an adopted child takes on a new legal persona can scarcely be made more clear than in this case, in which a child known as Z.C. became Skylar Quaid. To be sure, certain matters of consequence like his social security number and medical records may have accompanied Z.C.'s corporeal self through his transition to Skylar. In other important ways in the eyes of the law, when Skylar was "born" through his adoption by the Quaids, Z.C. legally expired. Under Utah law, the entry of the adoption decree created a parent-child relationship between Mr. and Mrs. Quaid and Skylar and caused the Quaids to "have all the rights and be subject to all the duties of that relationship." Utah Code Ann. § 78–30–10 (2006). The Quaids acquired "a constitutionally protected liberty and privacy interest in retaining custody of an adopted child." *Id.* § 78–30–4.12(2)(d). Conversely, with the entry of the decree of adoption, Z.C./Skylar's birth parents were "released from all parental duties toward and all responsibilities for the adopted child, and have no further rights with regard to that child." *Id.* § 78–30–11.

¶ 28 Our laws give expression to Utah's "compelling interest" in "providing stable and permanent homes for adoptive children in a prompt manner, in preventing the disruption of adoptive placements, and in holding parents accountable for meeting the needs of children." *Id.* § 78–30–4.12(2)(a). Stability and permanence are promoted by laws that permit an adoptive family to fully integrate an adopted child into its life. The goal of bringing an adopted child into the nurturing embrace of the adopting family is made less attainable when the health insurance coverage that is critical to a family's psychological and physical well-being is denied to the adopted child. It is furthermore clear that this state's interest in promoting parental accountability for meeting the needs of adopted children also falls victim to this circumstance.

¶ 29 To the defendant insurers, the event of young Z.C./Skylar's adoption by the Quaids, if relevant at all to the legal analysis of the issues in this case, deserves little more than a footnote. To me, his status as an adopted child is the centerpiece of the analysis. The legal creation of Skylar Quaid was accompanied by the legal extinction of Z.C. The same force of law that brought Skylar Quaid into existence made him a stranger to Aetna's extension of benefits clause. The person who qualified as a member under Aetna's plan the instant before his adoption disappeared with the entry of the adoption decree.

¶ 30 To the extent that the conceptual formulation I have thus far presented does not provide a fully satisfying rationale for imposing on the Loren Cook Company the obligation to extend coverage to Skylar, those shortcomings are remedied by federal law. By its very title, section 1169(c)(1) contemplates the requirements of group health care plan coverage of dependent children in cases of adoption. It states:

Coverage effective upon placement for adoption. In any case in which a group health plan provides coverage for dependent children of participants or beneficiaries, such plan shall provide benefits to dependent children placed with participants or beneficiaries for adoption under the same terms and conditions as apply in

---

1. 29 U.S.C. §§ 1001–1461, as amended by 29 U.S.C. § 1169(c).

**532**

the case of dependent children who are natural children of participants or beneficiaries under the plan, irrespective of whether the adoption has become final. 29 U.S.C. § 1169(c)(1).

¶ 31 My reading leaves me convinced this statutory provision is animated by an intention to provide persons contemplating adoption with the assurance that they could know the scope of available coverage in advance of an adoption. Only then could they confidently pursue an adoption without the need to investigate and compare the health care benefits to which candidates for adoption might be entitled. The challenges posed by adoption are great enough. To add to them the obligation to obtain legal opinions concerning health care benefits is, at the very least, unseemly and rendered unnecessary under section 1169(c)(1). The mandate of section 1169(c)(1) is clear: Adopted children like Skylar are entitled to enjoy the same health plan coverage as the biological children of his adoptive parents. The statute neither invites nor admits exceptions.

¶ 32 Finally, I take up a matter that, unlike Skylar's adoptive status, is a footnote in this appeal, but one that merits greater prominence. Utah State Medicaid paid more than $420,000 for medical services rendered to Skylar. The circumstances that led Medicaid to make these payments are not clear, nor are they relevant to the issues we decide today. I am in no way troubled that the taxpayers of this state exhibited their compassion for a child in need by seeing to it that he was provided critical medical services. In light of our determination that the responsibility to pay for most if not all of these medical services fell to Loren Cook, I hope the compassion of our taxpayers is conditional and temporary.

¶ 33 Chief Justice DURHAM concurs in the concurring opinion of Justice NEHRING.

