**2015 UT App 18**

# THE UTAH COURT OF APPEALS

HEIDI KUHN,
Petitioner,
*v.*
RETIREMENT BOARD,
PUBLIC EMPLOYEES' HEALTH PROGRAM,
Respondent.

Opinion
No. 20130503-CA
Filed January 23, 2015

Original Proceeding in this Court

Barton H. Kunz II, Attorney for Petitioner

David B. Hansen, Liza J. Eves, and Erin L. Gill,
Attorneys for Respondent

JUDGE STEPHEN L. ROTH authored this Opinion, in which JUDGES
J. FREDERIC VOROS JR. and KATE A. TOOMEY concurred.[1]

ROTH, Judge:

¶1     Heidi Kuhn seeks judicial review of the decision by the Retirement Board (the Board) to uphold the denial of her claims for medical coverage by the Public Employees' Health Program (PEHP). Kuhn also contends that the Board erred in denying her request for attorney fees as consequential damages. We decline to disturb the Board's decisions.

---

1. After the case was submitted for decision without oral argument, *see* Utah R. App. P. 29(a)(2), Judge James Z. Davis recused himself and Judge Toomey replaced him on the panel.

BACKGROUND

¶2    In 2006, Kuhn had gastric bypass surgery, which involved the insertion of a Silastic band around her stomach. In October 2008, Kuhn enrolled in a PEHP medical plan. The plan's Master Policy excludes from coverage "Obesity Surgery such as gastric bypass . . . , including any present or future Complications" as well as "Complications as a result of non-covered or ineligible Surgery" (the Exclusions). Later that month, Kuhn began experiencing severe abdominal pain and vomiting. Kuhn's treating physician determined that the pain and vomiting resulted from constriction of Kuhn's stomach and intestines caused by a shift in the Silastic band. The physician opined that the band's movement was probably due to a normal shrinkage of the stomach. When her condition worsened, Kuhn underwent emergency surgery to remove the Silastic band.

¶3    PEHP subsequently denied coverage for the emergency surgery as well as for Kuhn's follow-up care to the extent those services related to or arose out of the gastric bypass surgery.[2] According to PEHP, removal of the Silastic band constituted a complication of the gastric bypass surgery, a procedure that the medical plan expressly excluded from coverage. Kuhn appealed PEHP's decision to the Board, and after a hearing on the parties' cross-motions for summary judgment, the Board affirmed.[3] The Board concluded that "[u]nder the clear and unambiguous

2. PEHP did cover other emergency medical services that were not related to the gastric bypass surgery. This opinion refers only to those services for which coverage was denied.

3. An adjudicative hearing officer initially affirmed PEHP's decision, and the Board formally adopted his decision two weeks later. We will refer only to the Board's decision, as it is the subject of judicial review.

language of the [medical plan's] Master Policy, the movement of the Silastic band was a Complication as a result of the ineligible and excluded obesity surgery." The Board also denied Kuhn's request that she be awarded attorney fees as consequential damages for the denial of her medical claims, concluding that "an award would not be warranted here based on the . . . findings and conclusions." Kuhn seeks judicial review of the Board's decisions.

ISSUES AND STANDARDS OF REVIEW

¶4    First, Kuhn challenges the Board's interpretation of the Master Policy Exclusions to deny coverage. "Insurance policies are contracts," and thus, they must be "interpreted under the same rules governing ordinary contracts." *Gee v. Utah State Ret. Bd.*, 842 P.2d 919, 920 (Utah Ct. App. 1992); *see also Quaid v. U.S. Healthcare, Inc.*, 2007 UT 27, ¶ 10, 158 P.3d 525 (noting that "an insurance policy is a contract between two parties" and should be interpreted using contract principles).

¶5    On this issue, Kuhn asserts that the Board "mistakenly concluded that the [Master] Policy clearly and unambiguously defined the unexplained movement of a Silastic band . . . as a Complication" of her 2006 gastric bypass surgery. Kuhn argues that, according to the Master Policy's plain language, neither the Exclusions nor the definition of the term "Complication(s)" excludes her emergency surgery from coverage. When "the language within the four corners of the contract is unambiguous, . . . the contract may be interpreted as a matter of law," *WebBank v. American Gen. Annuity Serv. Corp.*, 2002 UT 88, ¶ 19, 54 P.3d 1139 (citation and internal quotation marks omitted), and on review, we will afford no deference to the Board's interpretation. Alternatively, Kuhn contends that even if the constriction of her stomach and intestines was a complication of the gastric bypass surgery, she should not be denied coverage because the Master Policy is ambiguous regarding the scope of

coverage for complications that occur as a result of a pre-enrollment, non-covered surgery. "[W]hether a contract is ambiguous is a question of law." *Gee*, 842 P.2d at 921 (citation and internal quotation marks omitted).

¶6    Second, Kuhn contests the Board's decision to deny her request for attorney fees as consequential damages. This claim also depends upon the correctness of the Board's interpretation of the Master Policy. *See Mahmood v. Ross*, 1999 UT 104, ¶ 20, 990 P.2d 933 (explaining that to recover consequential damages, there must be damage stemming from breach of a contract).

ANALYSIS

I. Interpretation of the Master Policy

¶7    Kuhn's first contention is that the Board erroneously interpreted the Master Policy when it denied coverage for the emergency surgery to remove the Silastic band. Kuhn makes two alternative arguments in support of her position. First, she argues that according to the plain language of the Exclusions, specifically the definition of the term "Complication(s)," PEHP ought to have covered the surgery. Second, she asserts that even if the emergency surgery is a complication of the pre-enrollment, non-covered gastric bypass surgery, it should nevertheless be covered because a reasonable person would not read the Master Policy to exclude complications that do not develop until after enrollment with PEHP. We address each argument in turn.

A.    The Board's interpretation of the policy Exclusions was correct.

¶8    Kuhn challenges the Board's conclusion that the removal of the Silastic band constituted a complication of the non-covered gastric bypass surgery. To determine whether Kuhn's medical condition was a complication of the gastric bypass

surgery, we first examine the language of the Master Policy. *See WebBank*, 2002 UT 88, ¶¶ 17–18 (explaining that because our purpose in interpreting contracts is to ascertain the parties' intent, appellate courts begin the process of interpretation by "look[ing] to the writing itself" (citation and internal quotation marks omitted)). If after "consider[ing] each contract provision . . . in relation to all of the others, with a view toward giving effect to all and ignoring none," we determine that the terms of the contract are unambiguous, *id.* ¶¶ 18–19 (omission in original) (citation and internal quotation marks omitted), we "interpret those terms in accordance with their plain and ordinary meaning," *Gee*, 842 P.2d at 921 (citation and internal quotation marks omitted). "Exclusions from coverage are interpreted no differently when the policy language is clear." *Quaid*, 2007 UT 27, ¶ 10.

¶9     Although each party advances a different legal interpretation of the term "Complication(s)," neither contends that it is ambiguous. *See Gee v. Utah State Ret. Bd.*, 842 P.2d 919, 921 (Utah Ct. App. 1992) (explaining that a contract may be unambiguous even though each party may "ascribe[] a different meaning to it to suit his or her own interests"). Based on our analysis, we conclude that the term is not ambiguous because it is not "capable of more than one reasonable interpretation." *See WebBank*, 2002 UT 88, ¶ 20 (citation and internal quotation marks omitted). The medical plan excludes "Complications" that occur "as a result of non-covered or ineligible Surgery." The term "Complication(s)" is defined by the Master Policy to include any "medical condition, illness, or injury related to, or occurring as a result of another medical condition, illness, injury, or Surgical Procedure."[4] Kuhn indisputably developed a "medical

---

4. Kuhn argues that the "Complication(s)" definition is missing a comma after the word "of" that would have set apart the phrase "or occurring as a result of" from the preceding phrase "related

(continued...)

condition . . . or injury"—constriction of her stomach and intestines—that required her to undergo emergency surgery to correct it. Thus, the only question is whether Kuhn's medical condition or injury occurred "as a result of" her earlier non-covered and ineligible gastric bypass surgery.

¶10   PEHP contends that we have already determined the meaning of the phrase "as a result of" in this context in our decision in *Gee v. Utah State Retirement Board*, 842 P.2d 919 (Utah Ct. App. 1992). In that case, the insured, Gee, sought judicial review of the Retirement Board's conclusion that emergency surgery to remove her silicone breast implants was a complication of a previous non-covered mastectomy. *Id.* at 920. As Kuhn did in this case, Gee underwent a non-covered surgery (bilateral mastectomy for a non-cancerous condition and reconstructive insertion of silicone gel implants) before she enrolled in a PEHP medical plan. *Id.* After joining PEHP, Gee underwent further surgery to remove the breast implants, which

---

to" in a grammatically significant way. According to Kuhn, had the definition read, "A medical condition, illness, or injury related to, or occurring as a result of[,] another medical condition, illness, injury, or Surgical Procedure," the language "occurring as a result of" would have refined the meaning and thereby limited the scope of "related to" so as to require not just relationship but causation. We do not address this particular argument because we accept that the Exclusions themselves seem to limit the definition to "Complications *as a result of* non-covered or ineligible Surgery." (Emphasis added.) *See WebBank v. American Gen. Annuity Serv. Corp.*, 2002 UT 88, ¶ 18, 54 P.3d 1139 (recognizing that in interpreting a contract, appellate courts must "consider each contract provision . . . in relation to all of the others, with a view toward giving effect to all and ignoring none" (omission in original) (citation and internal quotation marks omitted)).

by then had created a debilitating medical condition. *Id.* The medical plan had a provision, similar to the one at issue here, excluding coverage for "Complications as a result of [any] ineligible surgery." *Id.* PEHP, and later the Board, denied Gee coverage for the surgery to remove the implants on the basis that it was a complication "as a result of" the ineligible mastectomy and implantation. *Id.* We declined to disturb that decision. *Id.* at 921.

¶11 Although she recognizes the similarities between *Gee* and her case, Kuhn contends that *Gee* should not apply here because it is distinguishable in two significant ways.[5] First, she argues that her case is factually dissimilar because in *Gee* the breast implants failed whereas in her case the medical condition or injury arose from "normal bodily changes." Second, she asserts that the medical plan at issue in *Gee* "did not include a provision defining *complication* as is the case here" and *Gee*'s plain language approach therefore does not address whether Kuhn's emergency surgery constitutes a complication as a result of the non-covered gastric bypass surgery under her medical plan. We conclude that the distinctions Kuhn identifies are not legally significant.

¶12 Kuhn contends that *Gee* is distinguishable from her case because the medical condition requiring surgery in *Gee* was caused by a "failure" of the silicone implants, *id.* at 920–21, whereas Kuhn's condition arose from "normal bodily changes." It is not apparent, however, that our use of the word "failure" in

_____

5. In her brief, Kuhn asserts a third basis for distinguishing *Gee*: Gee's attorney conceded that Gee's post-enrollment surgery was not covered. *See Gee v. Utah State Retirement Board*, 842 P.2d 919, 921 n.1 (Utah Ct. App. 1992). We agree that Kuhn's case is distinguishable from *Gee* in that regard. However, this distinction does not render *Gee*'s reasoning inapplicable.

*Gee* was a reference to some fault in the silicone implant surgery or a defect in the implants themselves. *See id.* But even assuming that it was, we are not persuaded that there is a legal distinction, in the context of this health insurance coverage case, between a complication that stems from negligent surgery or defective materials and a complication that develops after a competent operation involving the use of defect-free materials. Indeed, nothing in the plain meaning of the definition of "Complication(s)" or any other language of the policy requires a finding of negligence or the use of defective materials in the original surgery for the exclusion of complications from prior non-covered procedures to apply. Rather, all that is required is that the complication have occurred "as a result of" the excluded procedure.

¶13    Kuhn also argues that her case differs from *Gee* because, unlike the policy in that case, the Master Policy here defines the term "Complication(s)." We disagree that the "Complication(s)" definition distinguishes this case from *Gee* in any legally meaningful way. The Master Policy in this case defines "Complication(s)" to include any "medical condition, illness, or injury . . . occurring as a result of another medical condition, illness, injury, or Surgical Procedure."[6] However, the phrase "as a result of" is not further defined, and thus, we must afford it its ordinary meaning. *Id.* The plain meaning of "as a result" is "consequently," *As a Result*, The Free Dictionary, http://legal-dictionary.thefreedictionary.com/as+a+result (last visited January 5, 2015), or "something that is caused by something else that happened or was done before," *Result*, Merriam–Webster Online, http://www.merriam-webster.com/dictionary/result (last visited January 5, 2015). This is essentially the same definition we applied in *Gee* using the plain language approach to define

---

6. As we explained in note 4, we have omitted the "related to" language from the definition of "Complication(s)."

an undefined term. In *Gee*, we determined that a complication that arises "as a result of" another medical procedure is an "issue often appearing suddenly and unexpectedly" "*as a consequence*, effect, or conclusion" of some medical procedure. *Gee*, 842 P.2d at 921 (emphasis added) (citations and internal quotation marks omitted). Thus, although *Gee* required us to interpret the medical plan without the benefit of an express definition of "complication," our conclusions about the term's meaning in *Gee* and in this case are essentially identical because the crucial concept connecting the original excluded surgery with the subsequent procedure is the same—"as a result of." In other words, in both *Gee* and this case, for a complication to result from an earlier surgery, it had to occur "as a consequence" of that earlier surgery, *id.*, or be the "something that is caused by something else that happened or was done before," *Result*, Merriam–Webster Online. And because our contractual analysis in *Gee* does not differ in any significant way from our approach here, the fact that "Complication(s)" is defined in the Master Policy at issue in this case does not distinguish it from *Gee*.

¶14    Kuhn nevertheless contends that this interpretation of the contract language is simply wrong, arguing that the phrase "as a result of" implies a causation standard more stringent than "consequently." In this regard, Kuhn is dismissive of the concept of "but-for" causation, arguing that to qualify as a complication under the Master Policy, the original gastric bypass surgery must have been the "mechanism" or a "proximate cause" of the stomach and intestine constriction that led to the emergency surgery to remove the Silastic band and not simply consequentially related to the prior surgery in a "but-for" sense.[7]

---

7. In her brief, Kuhn states that she "does not dispute the Board's conclusion that her pre-enrollment [gastric bypass] surgery was a but-for cause of her injury." She contends only that "but-for" causation is insufficient.

She contends that because the only evidence of the cause of the Silastic band's movement was normal bodily changes *after* the surgery, the surgery itself did not proximately cause her medical condition in 2008. Kuhn relies on tort cases, including *Raab v. Utah Railway Co.*, 2009 UT 61, 221 P.3d 219, and *Proctor v. Costco Wholesale Corp.*, 2013 UT App 226, 311 P.3d 564, to support this position. *See generally Raab*, 2009 UT 61, ¶¶ 22–23 & n.17 (noting that in negligence cases "there must be some greater level of connection between the act and the injury than mere 'but for' causation" because the "'cause in fact [or but for]' inquiry asks only whether a defendant's negligence, as a factual matter, played a role in bringing about the plaintiff's injury, [while] the 'legal [proximate] cause' inquiry focuses on the question of whether liability should attach to a particular cause in fact"); *Proctor*, 2013 UT App 226, ¶ 10.

¶15    In asking us to adopt a "proximate cause" standard, however, Kuhn is attacking the continued viability of the *Gee* precedent.

> Those asking [appellate courts] to overturn prior precedent have a substantial burden of persuasion. *See State v. Hansen*, 734 P.2d 421, 427 (Utah 1986). This burden is mandated by the doctrine of stare decisis. In *State v. Thurman*, 846 P.2d 1256 (Utah 1993), [the Utah Supreme Court] discussed stare decisis in the context of multiple panels of the court of appeals and emphasized the importance of its observance: "This doctrine, under which the first decision by a court on a particular question of law governs later decisions by the same court, is a cornerstone of the Anglo-American jurisprudence that is crucial to the predictability of the law and the fairness of adjudication." *Id.* at 1269.

*State v. Menzies*, 889 P.2d 393, 398–99 (Utah 1994). In other words, once a point of law has been decided, we will not overturn it lightly; rather, we must be "convinced that there has been a change in the controlling authority, or that our prior decision was clearly erroneous." *State v. Ingleby*, 2004 UT App 447, ¶ 7, 104 P.3d 657 (citing *Menzies*, 889 P.2d at 399 n.3). Kuhn has not met that burden, as *Gee* is clearly the controlling authority and Kuhn has not demonstrated any error in that decision, much less clear error.

¶16    The proximate cause principle is a development of tort law, and Kuhn has not made a persuasive case for simply importing tort causation principles into the interpretation of a contract provision dealing with events that "occur[] as a result of" excluded surgical procedures. Certainly in this case the concept of "but-for" causation does not trivialize the relationship between the surgery that inserted the Silastic band and the emergency surgery that removed it in the way that the tort cases reject. This is not the kind of circumstance where the antecedent event's link to an ultimate effect is attenuated, such as where the decision to take one route to work over another results in an accident that would not have occurred "but for" that otherwise innocuous choice. On the contrary, the band itself was the sine qua non of the subsequent medical condition and emergency operation, not simply a trivial link in an attenuated "but-for" causation chain.[8]

---

8. Kuhn alternatively contends that the Master Policy's definition of "Complication(s)" commands at least a "causal nexus" relationship. The "causal nexus" standard is "more than 'but-for' causation, but less than legal, proximate cause." *Viking Ins. Co. of Wis. v. Coleman*, 927 P.2d 661, 664 (Utah Ct. App. 1996). This is the standard we have imposed in an automobile insurance case to determine whether damages for bodily injury or property damage arose out of a car accident so as to be covered by the

(continued...)

¶17　In summary, the constriction of Kuhn's stomach and intestines was "a result of" her pre-enrollment gastric bypass surgery and thus amounted to a complication of that non-covered surgery. Such a complication is expressly excluded from coverage by the plain language of the Master Policy's Exclusions.

B.　There is no ambiguity regarding the scope of coverage for complications that result from pre-enrollment, non-covered surgeries.

¶18　Kuhn contends that even if the medical condition was a complication of the gastric bypass surgery, she should not have been denied coverage because the Master Policy is ambiguous regarding the scope of coverage for complications from a pre-enrollment, non-covered surgery that developed after enrollment with PEHP. The Exclusions preclude coverage for "Obesity Surgery such as gastric bypass . . . , including any present or future Complications" as well as "Complications as a result of non-covered or ineligible Surgery." According to Kuhn, "a person of ordinary intelligence and understanding" would not have read these Exclusions to include "complications from a surgery that occurred years before enrollment." Rather, she contends, a reasonable person would "interpret 'include[d]' complications and complications resulting from non-covered or

_____

governing automobile policy. *Id.* at 663–64. In that context, we interpreted the contractual phrase "arises out of" to require more than "but-for" causation. *Id.*

　　It may be argued that the facts of both *Gee* and this case satisfy this intermediate standard. We do not adopt the "causal nexus" standard in the instant case, however, because the Master Policy's plain language does not appear to require it.

ineligible surgeries as those linked to . . . *post-enrollment* obesity surgeries." (Alteration in original) (emphasis added).[9]

¶19　Although Kuhn does not label her argument as such, she seems to be taking a position akin to the reasonable expectations doctrine. "[T]he reasonable expectations doctrine authorizes a court confronted with an adhesion contract to enforce the reasonable expectations of the parties under certain circumstances." *Alf v. State Farm Fire & Cas. Co.*, 850 P.2d 1272, 1275 (Utah 1993); *Russ v. Woodside Homes, Inc.*, 905 P.2d 901, 906 n.1 (Utah Ct. App. 1995) (defining an adhesion contract as "an agreement forced on one party by another who has superior bargaining strength"); *see also Mellor v. Wasatch Crest Mut. Ins. Co.*, 2009 UT 5, ¶ 16, 201 P.3d 1004 (noting that "[i]nsurance contracts are generally drafted by the insurance companies and allow no opportunity for negotiation of the terms by the

---

9. Kuhn also asserts that a person of ordinary intelligence and understanding would not have realized that the denial in this case was based on the exclusion of complications from the ineligible gastric bypass surgery because "that clause was not initially cited by PEHP as the basis of the denial." The letter Kuhn cites in support of her assertion, however, informs her that the Master Policy's Exclusions listed "'Obesity surgery such as gastric bypass . . . including any present or future complications,'" that PEHP had "determined the services . . . were related to the non covered weight loss surgery," and that coverage for the emergency surgery "would therefore be denied." Although PEHP did not expressly state that it had determined that the emergency surgery was a complication of the non-covered gastric bypass surgery, that conclusion can be reasonably inferred from PEHP's reference to the Exclusions, its subsequent determination that the emergency surgery was related to a non-covered surgery, and its denial of coverage on this basis.

insured"). Kuhn contends that because the Exclusions can plausibly be read to exclude only surgeries (and resulting complications) performed after enrollment, that interpretation ought to be adopted under the principle that ambiguities in insurance contracts are interpreted in favor of coverage, not against it. *See Mellor*, 2009 UT 5, ¶ 16 (explaining that appellate courts "interpret insurance policies liberally in favor of the insured" and therefore "when an ambiguity exists in an insurance contract, that ambiguity is interpreted in favor of coverage"). As an initial matter, we note that the Board could not have violated the reasonable expectations doctrine because Utah courts have declined to adopt it. *Kramer v. State Ret. Bd.*, 2008 UT App 351, ¶ 25, 195 P.3d 925. But more importantly, Kuhn has not established any ambiguity in the Master Policy's language, a prerequisite to interpretation in favor of coverage under either the reasonable expectations doctrine, *Alf*, 850 P.2d at 1275, or the principles for interpreting insurance contracts generally, *Mellor*, 2009 UT 5, ¶ 16.

¶20    "Contract language may be ambiguous if it is unclear, omits terms, or if its terms used to express the intention of the parties may be understood to have two or more plausible meanings." *Gee v. Utah State Ret. Bd.*, 842 P.2d 919, 921 (Utah Ct. App. 1992) (citation and internal quotation marks omitted). Kuhn asserts that the Exclusions language is ambiguous by pointing to the portion of the Master Policy that states that coverage begins *after* enrollment. But the fact that coverage does not begin until after enrollment does not by itself create a question about the scope of the Exclusions. The Exclusions clearly exclude coverage for "Obesity Surgery such as gastric bypass . . . , including any present or *future* Complications." (Emphasis added.) They do not include any apparent limitation on the timing of the original obesity surgery relative to enrollment in the PEHP medical plan or any contingency coverage if a complication from a pre-enrollment, non-covered surgery develops after enrollment in the PEHP plan. And the plain meaning of "future," *see id.* (explaining that when the

language is unambiguous, we accord it its ordinary meaning), is "coming after the present time," i.e., the time of the surgery, *Future*, Merriam–Webster Online, http://www.merriam-webster.com/dictionary/future (last visited January 5, 2015). Thus, the Exclusions language is clear, and a person of ordinary intelligence could not, as a matter of law, have reasonably understood it to mean that complications as a result of a pre-enrollment, non-covered gastric bypass surgery would be covered, while complications from a post-enrollment ineligible surgery would not be. *See Gee*, 842 P.2d at 921 (concluding, even in the absence of the explicit exclusion of future complications, that the PEHP Master Policy unambiguously excluded a post-enrollment surgery when the surgery was necessitated by "[c]omplications as a result of other ineligible surgery" (alteration in original)). Consequently, Kuhn's alternative argument also fails to demonstrate that the Board erred when it upheld PEHP's decision to deny benefits for the emergency surgery.

## II. Attorney Fees

¶21    Finally, Kuhn argues that the Board erred in denying her request for attorney fees as consequential damages of the denial of her claims. To recover consequential damages, a plaintiff must have demonstrated that there was a contract breach resulting in foreseeable and ascertainable damages. *Mahmood v. Ross*, 1999 UT 104, ¶ 20, 990 P.2d 933. Because we have upheld the Board's decision to grant summary judgment to PEHP on the ground that the Master Policy does not provide coverage for the emergency surgery or follow-up treatment, there was no breach of contract, and thus, Kuhn is not entitled to collect damages. We therefore decline to disturb the denial of attorney fees without undertaking any further analysis.

CONCLUSION

¶22   We decline to disturb the Board's decision to uphold PEHP's denial of coverage for Kuhn's emergency surgery and follow-up care because the constriction on Kuhn's stomach and intestines was a result of a non-covered surgery and therefore constituted an excluded complication. Because the Master Policy clearly excludes coverage for future complications of a non-covered surgical procedure, we also reject Kuhn's alternative claim that the policy was ambiguous regarding post-enrollment complications occurring as a result of pre-enrollment, non-covered surgeries and that, as a consequence, she could reasonably expect that such a complication would be covered. It follows from our conclusion that the Master Policy excluded coverage for Kuhn's emergency surgery and follow-up care that she is not entitled to damages for wrongful denial of her claims. Accordingly, we decline to disturb the Board's decision to deny Kuhn's request for consequential damages in the form of attorney fees.

———————